NOT FOR PUBLICATION                                     [Dkt. No. 11]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

VLADIMIR RENE,

             Plaintiff,

    v.

LIDESTRI FOODS, INC,

             Defendant.

Civil No. 09-3908 (RMB)

**OPINION**

Appearances:

> Peter L. Frattarelli
> Douglas Diaz
> Archer & Greiner
> One Centennial Square
> Haddonfield, NJ 08033
>     Attorneys for Defendant
>
> Andrew S. Abramson
> Abramson Employment Law, LLC
> 790 Penllyn Pike
> Suit 205
> Blue Bell, PA 19422
>     Attorney for Plaintiff

**BUMB**, United States District Judge:

I.    INTRODUCTION

    Plaintiff Vladimir Rene ("Plaintiff") filed a Complaint alleging his employer,

Defendant Lidestri Foods, Inc. ("Lidestri"), discriminated against him on the basis

of his "race, national origin and color" (Compl. ¶ 34), and terminated his

employment in retaliation for his reporting this discrimination.  Plaintiff seeks damages, injunctive, and equitable relief pursuant to the New Jersey Law Against Discrimination ("LAD") N.J.S.A. 10:5-1 et seq.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332, in that Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000. Defendant now moves for summary judgment.


II.   BACKGROUND

Lidestri is a company that manufactures tomato sauces, salsas, and dips at several manufacturing locations nationwide.  Its corporate headquarters is located in Fairport, New York. In April 2008, Plaintiff, who is of Haitian descent, and is black in skin color, started working for Lidestri at its Pennsauken, New Jersey plant as a quality control lab technician through a temporary employment agency. On October 14, 2008, Lidestri hired Plaintiff directly as a quality control technician for the third shift, which was from 9 p.m. until 5:30 a.m.

As a quality control lab technician or "QC tech", Plaintiff's job duties included testing the sauce, taking the pH, and sometimes checking what was referred to as the "Clean in Place" or "CIP" work.  The CIP work refers to the cleaning and the sanitation of the equipment that is performed by the production or sanitation departments. The QC techs are responsible for verifying or inspecting the CIP work. Naturally, the CIP work cannot be checked until after the CIP was

completed. Plaintiff performed these CIP checks, which took between one-and-a-half hours to two hours to complete, "many times."

Plaintiff's supervisor was James Clavin, who was the Quality Assurance Manager and typically worked from 6 a.m. to 3 p.m. On Plaintiff's shift, there were two production managers, Virgil Miller and Michael Horgan, and a sanitation manager, Ted DiLeo. Miller was the senior manager for the third shift.

On the evening of December 13, 2008, Lidestri was running behind schedule with respect to production, which required that a third shift QC Tech needed to stay late  in order to perform the CIP checks.  There were two QC Techs working the third shift that day, Plaintiff and a second QC Tech named Iman Tavanania, who is of Iranian decent.

Sometime around 3 a.m. on the morning of December 14, Plaintiff and Tavanania were working in a quality control lab.  Lidestri manager Mike Horgan came to the lab and told Plaintiff and Tavanania that they would have to do CIP work.  Both responded that they were busy, to which Horgan said that they "better do it."  Approximately forty-five minutes later Horgan returned to tell Plaintiff and Tavanania that they had to do CIP work. Plaintiff again responded that he was busy with other work. Tavanania told Horgan that he could not stay past the end of his shift because of a family problem he had to attend to.

Horgan returned to the lab a third time, when only Plaintiff was present, and again told Plaintiff to do the CIP work. Plaintiff again said he could not leave what he was doing, and Horgan responded that he would "write up" Plaintiff.

3

Plaintiff's immediate supervisor testified that none of Plaintiff's responsibilities prevented him from leaving the lab. (Def.'s Ex. C (Clavin Dep. 18:3-8))

Horgan then contacted Miller and DiLeo and all three returned to the lab and told Plaintiff he had to do the CIP work. Miller and Deleo left the lab, and Horgan asked Plaintiff why he did not want to perform the CIP works, to which Plaintiff responded that he was busy and his quality control work takes priority. Horgan left the lab but soon returned to yell at Plaintiff to do the CIP work. Horgan also told Plaintiff that he was the supervisor and could tell Plaintiff what to do. Horgan then allegedly whispered to Plaintiff: "you're a nigger."

Angry and feeling humiliated, Plaintiff left the lab and Horgan followed, grabbing Plaintiff's arm to stop him. Miller, who was also outside the lab, saw Horgan and Plaintiff in a heated conversation, but did not see Horgan grab Plaintiff's arm. Miller told Horgan he would "handle the situation" and returned to the lab with Plaintiff. At this point, Plaintiff told Miller "don't play with a lion tail when it's sleeping." Miller told Plaintiff he interpreted this as a threat, and Plaintiff did not dispute this interpretation. Plaintiff did not tell Miller that Horgan had said, "you're a nigger." Miller told Plaintiff "to punch out and go home," although Plaintiff continued to work and stayed past his scheduled stop time.

Once at home, Plaintiff emailed Clavin about his altercation with Horgan and Miller. Plaintiff's email recounted the facts related above. Plaintiff reported that Horgan repeatedly asked him to do the CIP work and that Plaintiff told him that he could not because he was busy.  Plaintiff complained that Horgan was

arrogant, did not speak to Plaintiff with respect, that Horgan occasionally tried to "start a drama" with Plaintiff, that Horgan (and possibly Miller) had tried to disrespect and humiliate Plaintiff on different occasions, and finally that Plaintiff wanted to file a harassment complaint. Yet Plaintiff made no mention of Horgan's slur and did not state or imply that Horgan's hostility was based on Plaintiff's race, color, or national origin.

That morning, Horgan and Miller wrote-up both Plaintiff and Tavanania for insubordination and lack of teamwork. They also wrote-up Plaintiff for threatening Miller. Horgan and Miller then emailed Clavin and Lidestri Human Resources Manager Kathleen Jehens; the email was copied to Plant Manager Wiley Hargrove III.

Horgan and Miller's email and Plaintiff's email are consistent with respect to the material facts. Both confirm that Plaintiff was told to do CIP work and refused to so on the grounds that he was busy.[1] Miller and Horgan also noted that Plaintiff threatened Miller, while Plaintiff omitted this fact from his email, he does not deny that he made the statement to Miller. Otherwise the differences are immaterial. Plaintiff's email complained that Horgan was arrogant and

---

[1]    Plaintiff also suggests that the managers were not authorized to ask Plaintiff to stay late to do the CIP work. Lidestri's employee handbook states that overtime must be authorized in advance by the plant manager. Lidestri's Rule 30(b)(6) witness testified that this was to prevent employees from working overtime on their own initiative. It is undisputed that Plaintiff worked overtime on multiple occasions when directed by his supervisor James Clavin, who is not the plant manager, and by an assistant supervisor, also not the plant manager.

disrespectful, while Horgan and Virgil wrote that Plaintiff's refusals included expletives, statements to the effect that Horgan and Virgil could not tell Plaintiff what to do, and that they were not Plaintiff's boss. Both emails reported that Plaintiff was told to punch out and go home but Plaintiff stayed nonetheless.

Plaintiff and Clavin spoke by telephone that evening and Plaintiff attempted to explain what had happened. Clavin interrupted Plaintiff and told him to talk to Human Resources. Plaintiff made no reference to Horgan's slur and did not state or imply that Horgan discriminated against Plaintiff.

Hargrove and Jehens received the email from Miller and Horgan on Monday, December 15. Hargrove responded writing, "My suggestion is call him to get his side of the story and if it pans out get rid of him for insubordination and threatening a Supervisor," and solicited Clavin and Jehens' input. Clavin responded by forwarding Plaintiff's email, i.e., Plaintiff's side of the story, which was consistent with Miller and Horgan's in all material respects. Jehens forwarded the emails to Corporate Human Resources Manager Jane Oca, and asked whether Plaintiff should be terminated. Oca and Jehens then spoke by telephone and agreed that Plaintiff should be terminated.

On December 15, Plaintiff called the Human Resources department. Human Resources told him they would call him back, which they did an hour later and told Plaintiff that he did not need to come into work anymore. Plaintiff was also asked whether he had anything to say, and Plaintiff said he did not. Plaintiff was

formally terminated that day for insubordination and cursing at a manager. Tavanania was not terminated.

Lidestri did not believe that Plaintiff's statement that he intended to file a harassment complaint implicated the company's harassment policy because Plaintiff had never indicated that the harassment was based on his race, color, or national origin. The actual harassment policy, however, states that Lidestri is committed to "maintaining a work environment free from all forms of harassment," and that Lidestri "prohibits harassment for any reason."

There are neither allegations nor evidence that, besides Horgan's slur on the night in question, anyone at Lidestri had acted or commented on Plaintiff's or anyone else's race, color, or national origin. Plaintiff does offer testimony of another Lidestri employee, Jerry Posey, that Horgan "makes black employees do jobs that are not within their job descriptions and does not treat others the same way." (Pl.'s Supp. Stmt. of Facts ¶ 37.)

III.   SUMMARY JUDGMENT

A.    Standard

Summary judgment will be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

"In making this determination, a court must make all reasonable inferences in favor of the non-movant." *Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F.Supp. 79, 81 (D.N.J. 1990) (*citing Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983)). However, "the party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading'; its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed.R.Civ.P. 56(e)); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B.     Analysis

As noted, Plaintiff alleges two claims pursuant to New Jersey's Law Against Discrimination.

1. Plaintiff's Wrongful Termination Claim

Plaintiff first alleges Lidestri terminated him because of race, color, and national origin.[2] (Compl. ¶¶ 32-34.) Defendant requests summary judgment on

---

[2]     Notably, Plaintiff has not argued that he was subjected to a hostile work place environment. (*See, e.g.,* Pl.'s Opp. at 10 (stating that allegations are of

this claim and argues that Plaintiff fails to establish even a prima facie case of discrimination because, notwithstanding Horgan's slur, Plaintiff was fired for insubordination. Defendant further argues that even if Plaintiff has established a prima facie case of discrimination, Defendant has shown there was a legitimate reason for Plaintiff's dismissal and Plaintiff has no evidence that this proffered reason is merely pretext. Finally, Defendant argues that there is no evidence that the individuals who made the actual decision to terminate Plaintiff had any discriminatory intent, or even knowledge, of Plaintiff's race, color, or national origin.

Plaintiff claims he has made a prima facie case of discrimination because of Horgan's slur and because he was not treated the same as Tavanania, who was also insubordinate. Plaintiff further argues that Lidestri's preferred reason for his termination is merely pretext for a number of reasons including that Plaintiff was provoked by Horgan's slur and that Miller and Horgan did not actually feel threatened by Plaintiff's lion comment.

New Jersey enacted the LAD in furtherance of the state's public policy "to eradicate invidious discrimination from the workplace." *Carmona v. Resorts Int'l Hotel, Inc.*, 189 N.J. 354, 370 (2007) (*quoting Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 630 (1995)). It is unlawful "[f]or an employer, because of the race . . . of any individual, . . . to discharge" such a person "unless justified by lawful

---

discrimination in his termination, and retaliation))

considerations . . . ." N.J.S.A. 10:5-12(a). The LAD specifically does not "prevent the termination . . . of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards." N.J.S.A. 10:5-2.1.

New Jersey's courts analyze LAD claims under a framework developed for the LAD's federal analog, Title VII of the Civil Rights Act of 1964, *Grigoletti v. Ortho Pharmaceuticals Corp.*, 118 N.J. 89, 97-98 (1990), which also prohibits discrimination by covered employers on the basis of race, color, religion, sex or national origin, 42 U.S.C. § 2000e. Thus, an LAD claim of workplace discrimination requires Plaintiff to "show that the prohibited consideration[, race,] played a role in the decision making process and that it had a determinative influence on the outcome of that process." *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 208 (1999); *see also Weldon v. Kraft, Inc.*, 896 F.2d 793, 796 (3d Cir. 1990). Plaintiff may do so by presenting direct evidence of discrimination or, in the absence of such evidence, "the plaintiff may prove intent through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." *Weldon*, 896 F.2d at 796*; Sisler*, 157 N.J. at 208.

Where an employee offers direct evidence of wrongful termination, to survive summary judgment the evidence must show, without inference or presumption, "that decision makers placed a substantial negative reliance on an illegitimate

criterion . . . in deciding to terminate his or her employment. . . . The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Sisler*, 157 N.J. at 208 (internal citations and quotation marks omitted). Where a plaintiff meets this rigorous burden to show a prima facie case that, in this case, race, color or national origin was a substantial factor in the decision to terminate, the burden shifts to the employer to show that the same decision would have been reached without consideration of the plaintiff's race, color or national origin. *Sisler*, 157 N.J. at 209.

Plaintiff's argument confuses the two standards and fails under both a direct and indirect evidence test. Plaintiff does not argue that there is direct evidence because it is undisputed that there is no "direct causal connection between [Horgan's] hostility and the challenged employment decision." *See Sisler*, 157 N.J. at 208. The factual basis for the decision to terminate Plaintiff is undisputed: Plaintiff was insubordinate and threatened Miller. Further, Plaintiff offers no evidence that Lidestri knew or should have known of Horgan's alleged racial animus. Plaintiff concedes that he never reported the slur and never complained about Horgan, and does not allege that anyone else at Lidestri harbors any animus to Plaintiff on account of his race, color or national origin. Finally, it is undisputed that Lidestri did not consult Horgan or request his input on the decision to terminate him threatening Miller. Thus, there is a no evidence of any direct causal connection between Horgan's hostility and Lidestri's decision to

11

terminate Plaintiff. Accordingly, Plaintiff has failed to establish a case of direct discrimination. *See, e.g., Sisler*, 157 N.J. at 208; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (stray remarks in the workplace, unrelated to decisional process, not sufficiently direct evidence of discrimination).

While Plaintiff instead argues that he has established a prima facie case of indirect discrimination, this too fails for lack of evidence of causality. Where an employee offers indirect evidence of wrongful termination, to survive summary judgment Plaintiff must present evidence from which "a factfinder could infer that the proffered reason did not actually motivate the employer's decision to terminate." *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 455-56 (2005). The analysis takes places in three stages, the first of which requires the plaintiff to establish a prima facie case by showing "that discrimination *could* be a reason for the employer's action." *Zive*, 182 N.J at 447 (*quoting Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996)). If the plaintiff satisfies this burden the employer must then "articulate a legitimate, nondiscriminatory reason for the employer's action." *Zives*, 182 N.J. at 449. Provided the employer can do so, the final stage requires the plaintiff to show "that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision. *Zives*, 182 N.J. at 449.

"The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court." *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003). To establish a prima facie case of disparate

treatment, Plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the job; (3) he is negatively affected by the employer's decision; and (4) he was treated less favorably than similarly situated employees not within the protected class. *Mandel v. UBS/Painewebber, Inc.*, 373 N.J. Super. 55, 860 A.2d 945, 953 (N.J. App. Div. 2004); *Murphy v. Housing Authority and Urban Redevelopment Agency of the City of Atlantic City*, 32 F. Supp. 2d 753, 763 (D.N.J. 1999). In the context of disparate disciplinary treatment, New Jersey's courts have articulated the last two steps as requiring the employee to show:

> . . .
>
> (3)   That the non-minority employees either were given the benefit of a lenient [disciplinary] practice or were not held to compliance with a strict company policy; and
>
> (4)   That the minority employee was disciplined without application of a lenient policy, or in conformity with the strict one.

*Jackson v. Georgia-Pacific Corp.*, 296 N.J. Super. 1, 21 (N.J. App. Div. 1996) *cert. denied* 149 N.J. 141 (1997). Although the elements should be adjusted for the particulars of each case and should not be applied mechanically, it is essential that, no matter the form of the individual elements, the indirect evidence "establish a logical reason to believe that the decision rests on a legally forbidden ground." *Sisler*, 157 N.J. at 213. In sum, a prima facie case must support the inference that Plaintiff was discriminated against *because of* his race, color, or national origin - it is not prima facie discrimination to simply be a member of a protected class who is subjected to a negative employment decision.

13

Here, Plaintiff alleges he is a member of a protected class by virtue of his race, color and national origin because Plaintiff is "of Haitian descent, African American and black skinned." (Compl. ¶ 1.) Plaintiff further alleges he is qualified for his job and that his termination raises the inference of discrimination because of Horgan's slur and because Tavanania, who is not black, African-American, or Haitian, was not terminated even though he too refused to do the CIP work.

Horgan's slur against Plaintiff is insufficient indirect evidence for the same reason it is insufficient direct evidence. There is no evidence from which a reasonable trier of fact could infer a causal connection between Horgan's animus and Lidestri's termination of Plaintiff.

Lidestri's treatment of Tavanania, alone or in conjunction with Horgan's slur, is also insufficient. Lidestri's treatment of Tavanania is insufficient because he was not similarly situated such that a reasonable trier of fact could look at Lidestri's treatment of both Tavanania and Plaintiff and infer that the latter was disciplined differently, i.e., terminated, because of his race, color or national origin. "To be deemed 'similarly situated,' the plaintiff must show that the other employee's acts were of comparable seriousness to his own infraction." *Crumpton v. Potter*, 305 F. Supp. 2d 465, 472 (E.D.Pa. 2004). "[T]he individual with whom the plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id. See also, Johnson v. Atlantic City*, No. 07-4212, 2010 WL 743930, 2010 U.S. Dist. LEXIS 19317, *42,

14

(D.N.J. March 3, 2010) (holding lack of "comparable evidence of disproportionate punishment" failed to establish prima facie case of disparate treatment).

At various times during the shift Lidestri managers told both Plaintiff and Tavanania that CIP work needed to be done. Both refused. Tavanania claimed that he had family matters to attend to. He was written up for his refusal. (Def.'s Ex. J.) Plaintiff simply refused without any meaningful explanation: Defendant claims Plaintiff stated that the managers could not tell him what to do; Plaintiff denies this and claims he could not interrupt what he was doing. Regardless, it is undisputed that Plaintiff repeatedly refused to do the CIP work and there is no evidence - only allegations - that Plaintiff was unable to interrupt what he was doing. After heated exchanges Plaintiff admits that he responded "angrily" and told Miller, "don't play with a lion tail when it's sleeping," which Miller understood to be a threat. Miller and Horgan then wrote-up Plaintiff for insubordination and for threatening Miller.

Based on the undisputed facts, Plaintiff has failed to demonstrate that other employees "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [his] conduct or the employer's treatment of them for it." *See Crumpton*, 305 F. Supp. 2d at 472. With regard to Lidestri's treatment of Tavanania, most significant is the fact that Plaintiff threatened Miller and Tavanania did not. However, it is also relevant that, unlike Tavanania, Plaintiff did not justify his refusal to do the CIP work. Together, these differentiating circumstances place Plaintiff's conduct, and Lidestri's response, in

a very different category than Tavanania and render Tavanania an unsuitable comparison. Further, Plaintiff offers no evidence of Lidestri's disciplinary policies with respect to insubordination or threats to other employees.  He also offers no evidence of whether Lidestri has a policy of more leniently disciplining non-minority employees, or more strictly disciplining black-skinned, African-American, or Haitian employees.[3] Accordingly, Lidestri's treatment of Tavanania and Plaintiff does not permit an inference that Plaintiff's termination was because of his race, color, or national origin.

Finally, Plaintiff argues that, notwithstanding the lack of evidence of a causal connection between Horgan's animus and Lidestri's decision to terminate Plaintiff, summary judgment can be denied under a theory that Horgan "use[d the] formal decision makers as dupes." (Pl.'s Opp. at 15.) Under this theory - sometimes referred to as the "cat's paw" theory - "it is sufficient [to show] those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001). In *Abramson*, there was abundant evidence that a college professor was terminated only after the college President "sought input on the decision to retain" the professor from two individuals who had demonstrated discriminatory animus. *Id.* The Supreme Court has recently granted certiorari in

---

[3]     Similarly, the testimony that Horgan makes black employees do jobs outside their job descriptions is too general and conclusory, and irrelevant to whether Lidestri terminated Plaintiff because of his race, color, or national origin.

*Staub v. Proctor Hospital*, No. 09-400, 130 S. Ct. 2089 (2010), to consider an employer's liability "based on the unlawful intent of [those] who caused or influenced but did not make the ultimate employment decision." In *Staub*, the employee alleged the employer was supplied with false information by a supervisor that harbored discriminatory animus and the employer relied on this false information without conducting an investigation. 560 F.3d 647, 655 (7th Cir. 2009) *cert. granted*, 130 S. Ct. 2089 (2010).

Here, there is no evidence of a "cat's paw" because Horgan had no input whatsoever on how Plaintiff was to be disciplined for refusing to do the CIP work and threatening Miller. Both Miller, who is not alleged to harbor any animus, and Horgan reported the facts, and Plaintiff does not dispute that he threatened Miller and refused to do the CIP work. Upon receipt of Miller and Horgan's email, Lidestri's Plant Manager, Wiley Hargrove, suggested Plaintiff should be terminated. Human Resources employees Jehens and Oca discussed the matter and agreed Plaintiff should be terminated. Clavin sent Plaintiff's email to Human Resources, which email was consistent with Miller and Horgan's account. This email re-affirmed Lidestri's decision to terminate Plaintiff.[4] Thus, there is again no evidence from which the trier of fact could infer that Horgan, out of racial animus,

---

[4]     Plaintiff also argues that the causal connection is satisfied by Human Resources' "knowledge that Plaintiff is of Haitian descent." (Pl.'s Opp. at 16.) Mere knowledge that Plaintiff is a member of a protected class, however, does not give rise to the inference that Plaintiff was terminated *because of* his membership in a protected class.

manipulated or even influenced Lidestri's decision to terminate Plaintiff for threatening Miller and refusing to do the CIP work.

Ultimately, Plaintiff offers no evidence from which a reasonable trier of fact could infer that Lidestri terminated Plaintiff because of his race, color or national origin. Defendant's motion for summary judgment on Plaintiff's termination claim will be granted.

### 2. Retaliation Claim

Plaintiff also asserts a claim for retaliation in violation of the LAD. The LAD's anti-retaliation provision provides, in relevant part, that it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden by this act...." N.J.S.A. 10:5-12(d). "To establish a prima facie case of discriminatory retaliation, plaintiffs must demonstrate that: (1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation." *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629-30, 660 A.2d 505 (1995); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

Plaintiff argues that he engaged in protected activity when he emailed Clavin that he intended to file a harassment complaint, and that Lidestri terminated him because of his complaint. Defendant disputes that a general complaint of "harassment" is a protected activity under the LAD. Further,

18

Defendant argues, there is no evidence Plaintiff was terminated *because of* his harassment complaint.

The Third Circuit has held, when interpreting a similar anti-retaliation provision under the Age Discrimination in Employment Act ("ADEA"), that a general complaint that does not mention the protected category at issue will not qualify as protected conduct. *Barber v. CSX Distribution Services*, 68 F.3d 694, 701-02 (3d Cir. 1995). In *Barber*, an employee attempted to argue that he was retaliated against in violation of the ADEA based on a letter he wrote complaining about the fairness of a decision to promote another employee to a position despite the plaintiff's twenty-one years of experience. *Id.* at 697. The Court held that this letter did not constitute protected conduct because "that letter does not explicitly or implicitly allege that age was the reason for the alleged unfairness." *Id.* at 702. As the Court reasoned, "[a] general complaint of unfair treatment does not translate into a charge of illegal age discrimination." *Id.*

The same is true here. The LAD's anti-retaliation provision specifies that a protected activity is one where "that person has opposed *any practices or acts forbidden by this act*," not where a person has opposed general harassment. *See* N.J.S.A. 10:5-12(d) (emphasis added). Plaintiff never mentioned, explicitly or implicitly, that Horgan demonstrated racial animus. Plaintiff did not report Horgan's slur to Miller on the night in question, to Clavin in the email that morning, or to Human Resources when he was asked if he had anything to say.

19

Rather, Plaintiff's email discussed Horgan's "disrespect" and other harassing and unfair behavior.   The use of this general term is insufficient where Plaintiff never alleged in any fashion that he was harassed because of his race, color, or national origin. *Barber*, 68 F.3d at 702; *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)("[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to constitute protected activity); *Booker v. Brown & Williamson Tobacco Co.*, Inc. 879 F.2d 1304, 1313-14 (6th Cir. 1989)(holding that "a vague charge of discrimination" in a letter does not constitute protected activity).

Even assuming Plaintiff's email did constitute protected activity, Plaintiff cannot establish the third prong for a prima facie case of retaliation. There is no causal connection between his termination and the alleged protected activity. Here, and before either Jehens or Oca were aware of Plaintiff's email, Jehens had already suggested to Oca that Lidestri terminate Plaintiff's employment. In this situation where the termination process had already commenced before notice of the protected activity, Plaintiff cannot establish the causation required for a retaliation claim. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)(employers "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

20

Plaintiff has failed to establish that a reasonable trier of fact could conclude that Lidestri terminated Plaintiff because of his complaint about harassment. Accordingly, Defendant's motion for summary judgment will be granted.

IV.   CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment will be granted.  An appropriate Order will issue this date.

Dated: <u>November 17, 2010</u>

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
United States District Judge